In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00185-CV
_____


IN THE INTEREST OF D.L.B.

On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 13-03-02580 CV

MEMORANDUM OPINION

L.J. (MOTHER) gave birth to her son, D.L.B., in March 2013. The Texas Department of Family and Protective Services (the Department), responded to an initial intake and spoke with the medical staff at the hospital when D.L.B. was born. The medical staff reported that D.L.B. tested positive for methamphetamines and amphetamines at birth. On March 11, 2013, the State filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship. The trial court held a final hearing, made findings, and entered a judgment terminating the parental rights of MOTHER and

1

D.B. (FATHER)[1]. In this appeal, MOTHER challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that statutory grounds for termination exist and that termination is in the best interest of her son, D.L.B. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (Q), (R), (2) (West 2014). We affirm the trial court's judgment.

<h2 align="center">LEGAL AND FACTUAL SUFFICIENCY</h2>

"The decision to terminate parental rights must be supported by clear and convincing evidence." *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014). A judgment will be affirmed if a parent committed one or more predicate acts or omissions and termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West 2014); *see also J.L.*, 163 S.W.3d at 84.

In reviewing the evidence for legal sufficiency, we consider all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.L.*, 163 S.W.3d at 84-85. We assume a factfinder

---

[1]Because FATHER has not appealed, we will limit all further discussion, except when otherwise required for context, to MOTHER.

resolved any disputed facts in favor of its finding, if a reasonable factfinder could do so, and "disregard all evidence that a 'reasonable factfinder could have disbelieved[.]'" *Id.* at 85 (quoting *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). When we review a termination of parental rights for factual sufficiency, we give "due consideration" to any evidence that the factfinder could reasonably have found to be clear and convincing. *J.F.C.*, 96 S.W.3d at 266; *see also In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *J.F.C.*, 96 S.W.3d at 266.

UNDERLYING FACTS

When D.L.B. was born, Rophelia Carroll, an investigator for the Department, responded to an initial intake and spoke with the medical staff at the hospital. The medical staff reported that D.L.B. tested positive for methamphetamines and amphetamines at birth. The staff also reported that although MOTHER tested negative for drugs at the time of D.L.B.'s birth, MOTHER tested positive for methamphetamines at an earlier pre-natal visit in December 2012.

On March 11, 2013, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination, an Order for Protection of a

Child in an Emergency, and Notice of Hearing. The Department obtained temporary managing conservatorship of D.L.B. in March 2013, and D.L.B. was placed with his great-grandparents, who were also raising MOTHER'S fourteen-year-old daughter. A bench trial was held approximately one year later.

Carroll testified that she explained to MOTHER, at the hospital, that the Department had received an intake report because D.L.B. tested positive at birth for drugs and because of MOTHER's alleged drug use and drug history. When Carroll interviewed MOTHER at the hospital, MOTHER admitted that she used marijuana and methamphetamines, and that she used methamphetamines while pregnant with D.L.B. FATHER was at the hospital and introduced himself to Carroll as D.L.B.'s father, and he also told Carroll that he and MOTHER were chronic methamphetamine users. Carroll testified that the Department was concerned because of MOTHER's and FATHER's admitted extensive drug use and criminal history, the couple's instability with housing and employment, the Department's prior history with the family, the fact that MOTHER's four other children were living with relatives because of MOTHER's instability, prior incarceration, and extensive drug use, the pending charges against MOTHER and FATHER for possession of methamphetamine, and the fact that MOTHER had

been diagnosed as bipolar with psychotic episode and manic depression in 2000, and had not been taking her medication.

At the final hearing, MOTHER testified by phone because she was incarcerated on drug charges. MOTHER explained that she had volunteered D.L.B.'s great-grandfather and step great-grandmother ("the great-grandparents") as a possible placement for D.L.B., and she was in favor of them caring for D.L.B. when he was placed with them. However, she found out about three weeks before trial that D.L.B.'s great-grandfather was dying of brain cancer, and she then decided against that placement because D.L.B. would not be raised by a blood relative if his great-grandfather died.[2]

MOTHER admitted that she served time in a federal penitentiary from 2001 to 2004 for bank fraud. MOTHER also admitted that she committed three drug offenses in 2012. In July 2013, MOTHER pleaded guilty to two counts of possession of a controlled substance, and she was sentenced for each count to five years of confinement (to be served concurrently). In July 2013, she was also convicted of another offense of possession of a controlled substance and received 365 days in county jail. Although she testified that she might be released on parole

_____

[2]Earlier in the case, MOTHER filed an affidavit relinquishing her parental rights as to D.L.B. After learning of her grandfather's medical condition, MOTHER asked the trial court to allow her to withdraw the affidavit. All parties agreed at trial to abandon the relinquishment affidavit as a ground for termination.

at some point, under the sentence MOTHER is currently serving, if she serves the maximum sentence, she will not get out of prison until April 2018.

MOTHER testified that she had been making progress on her family service plan. She explained that she completed a 12-step drug treatment program, a parenting seminar, and a psychological evaluation while she was in prison. She indicated that, due to her incarceration, she has not been able to attend court hearings, complete her random drug tests, participate in a parent collaboration group meeting, obtain suitable housing, or establish visitation with D.L.B. She admitted that she wants the Department to give her an "extension[,]" because she believes she could be paroled in six months, complete her service plan, and raise D.L.B. She also explained that the Department "tried to step in" in the past regarding one of her other children.

Upon MOTHER's release from prison, she plans on living with D.L.B. in the four-bedroom home where her mother (S.L.) and her mother's friend (E.K.) currently live. MOTHER testified that she had a job lined up with E.K.'s cleaning service. MOTHER planned on working with E.K. cleaning houses until she could secure the necessary training to pursue a career in landscaping. MOTHER testified that she did not suggest that D.L.B. be placed with S.L. during the past year because MOTHER wanted D.L.B. to be with his sibling at the great-grandparents'

6

house. MOTHER agreed that S.L. has never "had her own place[,]" and MOTHER does not know how much income S.L. has or if S.L. has a lease with E.K.

S.L. testified that she has been living with E.K. for the past three-and-a-half months. Prior to living with E.K., S.L. was a caretaker for two elderly people with whom she lived for two-and-a-half years, and there was no room for D.L.B. in their home. S.L. is unemployed and has never had a driver's license. S.L. now depends on E.K. for housing, financial support, and transportation. S.L. is not paying rent to E.K. S.L. knew about the Department's case when D.L.B. was placed with the great-grandparents, but S.L. made contact for the first time with D.L.B.'s caseworker about one week before trial.

E.K. testified that she and S.L. have been friends for over twenty years. E.K. explained that E.K.'s fifteen-year-old grandchild lives with E.K. and S.L. E.K. admitted she was convicted of delivery of a controlled substance in 1995 and served probation. E.K. admitted that her daughter, the mother of E.K.'s grandchild that lives with E.K., has a drug history and CPS history. E.K. testified that she plans on allowing MOTHER and D.L.B to live with her, and is willing to employ MOTHER upon her release from prison.

Jennifer Heimbach, the Department caseworker assigned to D.L.B.'s case, also testified. The Department established a family service plan for MOTHER,

which was tailored to allow MOTHER to complete some services while she is incarcerated. At the time of trial, MOTHER had not completed all of the tasks required by the family service plan, including but not limited to, the required twelve months of substance abuse treatment. Heimbach explained that termination of MOTHER's parental rights as to D.L.B. would be in D.L.B.'s best interest because D.L.B. "needs permanency" and a "safe, drug-free, crime-free home[,]" and that MOTHER has not been able to provide that for any of her five children. According to Heimbach, D.L.B. has bonded with the great-grandparents and they are willing to take care of him. Heimbach testified MOTHER has previously indicated to her that MOTHER wanted the great-grandparents to adopt D.L.B.

Heimbach testified that reuniting D.L.B. with MOTHER has never been the Department's goal. Heimbach expressed concerns about placing D.L.B. with S.L. because MOTHER has never mentioned S.L., and Heimbach was told that S.L. is homeless. Heimbach did not know anything about E.K., the person that S.L. lives with. When asked at trial whether Heimbach had investigated the background of S.L. or E.K., Heimbach explained that she had "never been given their information." Heimbach testified that she was only "recently" contacted by S.L. and E.K. According to Heimbach, MOTHER has never asked for D.L.B.'s placement to change, and MOTHER did not include S.L.'s name on the child

8

caregiver resource form, a form MOTHER was given on which she could indicate possible placements for D.L.B. The great-grandparents intend to adopt D.L.B., and Heimbach believes that D.L.B.'s placement with the great-grandparents is best for D.L.B.

P.W., the court-appointed special advocate (CASA) for D.L.B., testified that she has never met MOTHER and does not know anything about S.L. P.W.'s last visit with D.L.B. was two weeks prior to the trial. At that time, D.L.B. was residing with his great-grandparents. According to P.W., D.L.B. appears to have bonded with his great-grandparents and with his fourteen-year-old sibling who also lives with the great-grandparents. According to P.W., the great-grandparents have been meeting D.L.B.'s needs for over a year, and P.W. has no concerns with D.L.B. remaining in the great-grandparents' care. P.W. also stated that D.L.B.'s [step] great-grandmother is D.L.B.'s primary caregiver. She further explained that during the pendency of the case, the great-grandparents purchased a different home to provide a suitable place for D.L.B. to live.

P.W. opined that it would be detrimental to move D.L.B. out of his current placement, and that MOTHER would not be able to take care of D.L.B. if MOTHER were to be released. She also indicated that if the great-grandparents adopt D.L.B., he will be entitled to military benefits. According to P.W., even if

9

the great-grandparents are unable to adopt D.L.B., there are other family members that D.L.B. could live with and he will not go into foster care. P.W. did not believe an "extension" for MOTHER to comply would be appropriate in light of her history of addiction and her parenting inability. P.W. further testified that she believed it is in D.L.B.'s "best interest" that MOTHER's parental rights be terminated.

The trial court signed an order terminating MOTHER's parental rights as to D.L.B. The order also terminated the parental rights of FAHTER (as D.L.B.'s alleged father) and any unknown father of D.L.B. The trial court found that MOTHER (1) knowingly placed or knowingly allowed D.L.B. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed D.L.B. with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (3) knowingly engaged in criminal conduct that has resulted in MOTHER's conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition; and (4) had been the cause of D.L.B. being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (Q), (R). On appeal, MOTHER argues that the

10

evidence was legally and factually insufficient to support the finding that termination was proper under any of the stated grounds (stated Issues 1-4) and that the evidence is factually and legally insufficient to support the finding that termination is in the best interest of D.L.B. (stated Issue 5).

GROUNDS FOR TERMINATION

Because any one of the stated statutory grounds would be a sufficient basis for termination, we will address MOTHER's third issue first. MOTHER contends the trial court's findings, including the finding regarding subsection (Q), are not supported by clear and convincing evidence. Section 161.001(1)(Q) of the Texas Family Code provides that a trial court may terminate a parent's rights to her child if the parent has "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]" *See* Tex. Fam. Code Ann. § 161.001(1)(Q). Section 161.001(1)(Q) applies prospectively; thus, "'if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected.'" *In the Interest of H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *In the Interest of A.V.*, 113 S.W.3d 355, 360 (Tex. 2003)).

11

MOTHER was arrested at the beginning of the CPS case and was still incarcerated at the time of trial. According to MOTHER and the judgments admitted at trial, she knowingly engaged in criminal conduct which resulted in her being indicted for two counts of possession of a controlled substance and receiving a five-year sentence for each count, to be served concurrently. At the time of the termination trial, MOTHER was incarcerated on the two counts, and MOTHER's sentence carries a maximum sentence date of April 2018, which is more than two years from the date the Department's petition was filed.

On appeal, MOTHER states that "[i]n the instant case the issue is whether [she] has been able to provide for or arrange for the care of the child during her incarceration." MOTHER argues that the evidence at trial "shows definitively that [she] has arranged for the care of [D.L.B.] through a non-incarcerated family member and a non-incarcerated friend." MOTHER contends that subsection (Q) does not apply because she has shown that S.L. and E.K. are willing to assume her duties.

After the Department established that MOTHER knowingly engaged in criminal conduct that resulted in her incarceration for the period at issue, the burden shifted to MOTHER to produce evidence showing that she had arranged to take care of D.L.B. while incarcerated. *See In the Interest of Caballero*, 53 S.W.3d

391, 396, 397-98 (Tex. App.—Amarillo 2001, pet. denied); *see also In the Interest of H.R.M.*, 209 S.W.3d at 110. The burden then shifts to the Department to show that the arrangement would not satisfy MOTHER's duty to the child. *Caballero*, 53 S.W.3d at 396.

At trial, S.L. testified that she would care for D.L.B. at E.K.'s house during MOTHER's incarceration. The record, however, does not conclusively establish that placement with S.L. at E.K.'s house is a suitable placement for D.L.B. Under the Texas Family Code, the Department must investigate a proposed placement to determine if it is in the child's best interest. *See* Tex. Fam. Code Ann. § 264.754 (West 2014) ("Before placing a child with a proposed relative or other designated caregiver, the department must conduct an investigation to determine whether the proposed placement is in the child's best interest."); *see also id.* § 153.002 (West 2014) (providing that the best interest of the child is the primary consideration in determining conservatorship issues). At the time of trial, the Department had not completed a home study to determine whether placement for D.L.B. with S.L. and E.K. would be suitable. Heimbach, the Department caseworker, testified that S.L. and E.K. did not contact her until "recently." Heimbach explained she had met with MOTHER almost every month during the case, and MOTHER did not suggest S.L. as a possible placement for D.L.B. until approximately two weeks

13

before trial. In fact, MOTHER previously told Heimbach that S.L. is homeless. During the pendency of the case, MOTHER never requested that Heimbach should change D.L.B.'s placement. The court-appointed special advocate did not know S.L. "existed[,]" and testified she had not had a chance to do a preliminary home study on S.L. And, S.L. admitted that she did not contact the caseworker until one week before trial.

Moreover, the Department presented evidence that supports the trial court's conclusion that having S.L. provide care for D.L.B. while living with E.K. would not satisfy MOTHER's duty to the child. S.L. has only visited D.L.B. twice since his birth and has not established a bond with him. S.L. admitted that she knew D.L.B. was in the Department's custody during the case, but she never contacted the caseworker to check on D.L.B. during the pendency of the case. S.L. testified that it has been about twenty years since she has had a place of her own, and she has averaged about a year to year-and-a-half per residence in the past five or ten years. She explained that if D.L.B. is placed with her, she will not seek employment and will stay home to care for D.L.B. She admitted that she is dependent on E.K. for housing, transportation, and finances. S.L. stated that she has never had a driver's license. The trial court heard evidence regarding E.K.'s criminal history, and that E.K.'s daughter has a drug history and a CPS history.

14

On this record, the trial court could reasonably have concluded that MOTHER's proposed arrangement was not suitable for D.L.B., and that S.L. and E.K. were both unable to care for D.L.B. Having reviewed the record under the standard for legal and factual sufficiency, we conclude the trial court could reasonably form a firm belief or conviction based on clear and convincing evidence that MOTHER violated section 161.001(1)(Q) by knowingly engaging in criminal conduct resulting in her conviction, imprisonment, and inability to care for D.L.B. for the two-year period at issue. *See* Tex. Fam. Code Ann. § 161.001(1)(Q). We overrule issue three.

BEST INTEREST

In her fifth issue, MOTHER also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of MOTHER's parental rights is in D.L.B.'s best interest. Regarding the child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individual seeking custody; (5) programs available to assist this individual to promote the best interest of the child; (6) plans for the child by this individual or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or

15

omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014).

The trial court heard evidence that D.L.B. has bonded with the great-grandparents, they were the only "parents" he had ever known, they were meeting his needs, and they intended to adopt him. They purchased a suitable home for D.L.B. and are also caring for MOTHER's fourteen-year-old daughter. MOTHER has no relationship with D.L.B. MOTHER admits she cannot care for D.L.B. while she is incarcerated. MOTHER has not established that placing D.L.B. with S.L. and E.K. is a suitable arrangement during her incarceration. Upon her release, MOTHER plans on moving D.L.B. from his current placement to live with her and S.L. at E.K.'s, where S.L., at the time of trial, had lived for less than four months. The trial court heard evidence of MOTHER's drug history, drug use while pregnant with D.L.B., criminal history, inability to raise her other four children, and failure to complete her service plan. The Department caseworker and the court-appointed special advocate testified that they believe D.L.B. will be in danger if returned to MOTHER's care, and they believe it is in D.L.B.'s best interest that MOTHER's parental rights to him be terminated.

It was reasonable for the trial court to view the Department's plan that D.L.B. be adopted by the great-grandparents as the plan that better served D.L.B.'s best interest. We conclude that the trial court, on this record, could reasonably form a firm conviction or belief that termination of MOTHER's parental rights was in D.L.B.'s best interest. We overrule MOTHER's fifth issue. In light of our conclusions that factually and legally sufficient evidence supports MOTHER's termination under section 161.001(1)(Q), we need not address MOTHER's remaining legal and factual sufficiency arguments, as they relate to the other grounds for termination. *See* Tex. R. App. P. 47.1; *In the Interest of A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."). We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 18, 2014
Opinion Delivered September 25, 2014

Before Kreger, Horton, and Johnson, JJ.

17